# 23-7868

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

_____

BOARD OF TRUSTEES OF THE BAKERY DRIVERS
LOCAL 550 AND INDUSTRY PENSION FUND,

*Plaintiff-Appellant,*

v.

PENSION BENEFIT GUARANTY CORPORATION,

*Defendant-Appellee,*

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

PETITION FOR PANEL REHEARING AND
REHEARING EN BANC

Karen L. Morris
*General Counsel*
Daniel Liebman
*Deputy General Counsel*
John H. Ginsberg
*Assistant General Counsel*
Benjamin T. Kelly
*Deputy Assistant General Counsel*
Emily J. Allender
*Attorney*

Pension Benefit
Guaranty Corporation
445 12th St. S.W.
Washington D.C.
202 321-1588

# <u>TABLE OF CONTENTS</u>

RULE 40(B) STATEMENT ...................................................................1

ISSUES PRESENTED.........................................................................5

STATEMENT OF THE CASE..................................................................6

ARGUMENT FOR REHEARING............................................................ 10

    I.  29 U.S.C. § 1432(b)(1)(A)  unambiguously limits SFA to plans
        that were actually "in critical and declining status" between 2020
        and 2022, and because it terminated in 2016, the Fund was not in
        critical and declining status in those years………………………10

    II.  IRC § 432(k)(3)(A)(i) makes clear that a  plan is only eligible for
        SFA based on critical and declining status only if actually "in
        critical and declining status" …………………………………….11

    III. The panel relied on a canon of construction that does not apply to
        substantive interpretation of statutory language…………………16

CONCLUSION ................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Jam v. International Finance Corporation*, 586 U.S. 199 (2019)...........................17

*Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609 (1973)...............18

## Statutes

29 U.S.C. § 1081(c) ................................................................. 2, 9, 10, 11

29 U.S.C. § 1085(b)(6)................................................................. passim

29 U.S.C. § 1432(b)(1)(A) ............................................................ passim

29 U.S.C. § 1432(b)(1)(D) ............................................................ 15, 19

IRC § 432 ................................................................................. 14, 15

IRC § 432(a)(3).............................................................................15

IRC § 432(a)(4).............................................................................15

IRC § 432(b)(6)........................................................................ 12, 13

IRC § 432(k)(3)(A) .................................................................. 11, 14, 16

IRC § 432(k)(3)(A)(i) ............................................................ 3, 11, 12, 13

## Other Authorities

2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory*

   *Construction* § 51:8 (7th ed. rev. Aug. 2012) ......................................16

# RULE 40(b) STATEMENT

In 2021, Congress amended the Employee Retirement Income Security Act of 1974, (as cumulatively amended, ERISA) to create a "special financial assistance" (SFA) program for certain multiemployer pension plans.[1] Eligible plans receive the funds needed to pay all benefits through 2051.[2] Congress carefully circumscribed the program by limiting SFA to plans meeting very specific criteria.

A previously withdrawn employer reentered the Fund and agreed to contribute approximately $90,000 per year to the Fund on behalf of less than twenty employees.[3] The Fund then argued that it had been "restored," and so was entitled to more than a hundred million dollars of SFA.[4] While the district court correctly recognized that ERISA prohibits the restoration of a terminated plan, and so found the Fund was not eligible for SFA,[5] the panel reversed. But the panel did not find that ERISA permits the restoration of a terminated plan. Instead, it held that a plan may be eligible for SFA *even if it has terminated.*[6]

---

[1] *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9704, 135 Stat. 4, 190.

[2] 29 U.S.C. §§ 1432(a)(1)(i)-(j).

[3] J.A. 568.

[4] *Id.* 537.

[5] S.A. 17-21, Dkt. 37.

[6] Op. 10-13.

The panel's decision conflicts with the bedrock principle that, when a "statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms."[7] Under 29 U.S.C. §1432(b)(1)(A), a plan is eligible if "in critical and declining status (within the meaning of section 1085(b)(6) of this title)" between 2020 and 2022. The panel held:[8]

> by using the phrase "within the meaning of section 1085(b)(6)" . . . the SFA statute incorporates by reference only the definition contained in section 1085(b)(6). It does not incorporate external limitations on section 1085's operation, such as the limitation contained in section 1081(c) [providing that ERISA's funding rules under ERISA no longer apply after plan termination].

This is wrong, for at least two reasons.

First, section 1085(b)(6), a provision of ERISA's funding rules, is specifically governed by section 1081(c)'s express exclusion of terminated plans. The definition under section 1085(b)(6) was written as part of and subject to funding rule exclusions. When Congress referenced section 1085(b)(6) in defining plans eligible for SFA, it referenced a provision that has long been limited to plans that have not previously been terminated. There is no legal or policy reason to interpret Congress's reference to a provision that had never applied to terminated

---

[7]  *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (cleaned up); *Soliman v. Subway Franchisee Advert. Fund Tr., LTD.*, 101 F.4th 176, 181 (2d Cir. 2024).

[8]  Op. 10.

plans to now do so, absent any action suggesting Congress intended such a dramatic change.

Second, the statute twice requires that an eligible plan must actually have been *in* critical and declining status between 2020 and 2022. The panel relied on the eligibility test in 29 U.S.C. § 1432(b)(1)(A), under Title IV of ERISA, but ignored that the eligibility rules are also codified under Title II of ERISA, at section 432(k) of the Internal Revenue Code (IRC). IRC § 432(k)(3)(A)(i) requires that a plan be "*in* critical and declining status" to be eligible for SFA—and does not refer to "within the meaning of section 1085(b)(6)." Thus, contrary to the panel's decision, Congress did *not* simply "cut and paste" the definition of "critical and declining status" into the eligibility test.[9] And to the extent that section 1432(b)(1)(A) wasn't clear enough as to whether a plan must actually be "in critical and declining status" to qualify for SFA—and so, whether a terminated plan may receive the funds—the parallel IRC provision further shows that it must.

Under a plain reading of these provisions, the Fund was not "in critical and declining status (within the meaning of section 1085(b)(6))" at any time between 2020 and 2022. The plain meaning of 29 U.S.C. § 1432(b)(1)(A) is that Congress conditioned relief on a plan having actually been *in* critical and declining status

---

[9] Op. 10.

during a plan year from 2020 to 2022. Because it terminated in 2016, the Fund was not "in critical and declining status (within the meaning of 1085(b)(6))." If Congress had wanted to expand the meaning of "critical and declining" to encompass terminated plans, it would not have expressly referenced a statutory provision that has always excluded previously terminated plans as a matter of statutory design, much less have done so without even a single reference to alter the settled meaning.

Congress did not intend to allow the Fund or any other terminated plan to manipulate the SFA program. Were it so easy to evade the law's requirements, the door would be thrown open to the expenditure of billions of dollars in additional payments at taxpayer expense. Before the panel's decision, the program was projected to provide approximately $79.7 billion to about 210 severely underfunded plans.[10] Under the panel's construction, about 130 more plans would be eligible to receive SFA, at the cost of billions more taxpayer dollars. Given the potential expenditure of enormous sums beyond what was contemplated by Congress, whether this sort of transparent end-run around Congressional intent

---

[10] PBGC, *FY 2022 Projections Report*, 12 (Aug. 2, 2023), https://www.pbgc.gov/sites/default/files/documents/fy-2022-projections-report.pdf.

should be permitted without explicit Congressional authorization is of exceptional importance.

## ISSUES PRESENTED

A plan is eligible for SFA if in "critical and declining status in any plan year beginning in 2020 through 2022." "Critical and declining status" is a creature of ERISA's funding rules, and they do not apply after the year in which a plan terminates because its last contributing employer completely withdrew.

It is undisputed that the Fund terminated when its last contributing employer withdrew in the plan year beginning November 1, 2016 (PY2016). In 2022, the Fund applied for $132 million in SFA, asserting that it ceased to be terminated when a former contributing employer agreed to resume contributing in PY2021, and that the Fund was therefore eligible for SFA as a plan in critical and declining status in PY2021. PBGC denied the application, because ERISA prohibits restoration of a multiemployer plan terminated by mass withdrawal. The issue before the Court was whether PBGC's determination that the Fund was ineligible was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and so subject to invalidation under the Administrative Procedure Act. The issues presented for rehearing are outlined below.

# STATEMENT OF THE CASE

PBGC administers the federal insurance program for private sector defined benefit pension plans under Title IV of ERISA.[11] PBGC insures payment of benefits under single- and multiemployer plans, subject to statutory limits.[12]

The American Rescue Plan Act of 2021 (ARP)[13] amended Title IV of ERISA to create the SFA program to give eligible multiemployer plans lump-sum payments of taxpayer monies necessary to pay projected benefits through the plan year ending in 2051.[14] The SFA program is projected to provide an estimated $79.7 billion to about 210 severely underfunded pension plans.[15] PBGC has already approved nearly $73 billion in SFA to 77 plans covering nearly 2 million Americans.[16]

SFA is payable to plans satisfying any of four tests, including plans in "critical and declining status" in a plan year beginning in 2020 through 2022.[17] Such status affords the plan statutory tools for improving its funded status,

---

[11]  29 U.S.C. § 1302(a).

[12]  29 U.S.C. §§ 1322, 1322a, 1361.

[13]  Pub. L. No. 117-2, § 9704, 135 Stat. 4, 190 (2021).

[14]  29 U.S.C. §§ 1432(a)(1)(i)-(j).

[15]  PBGC, *FY 2022 Projections Report* 12 (Aug. 2, 2023), https://www.pbgc.gov/sites/default/files/documents/fy-2022-projections-report.pdf.

[16]  PBGC, *sfa-application-status-current.xlsx*, sheet 2, "SFA Approved," https://www.pbgc.gov/sites/default/files/documents/sfa-application-status-current.xlsx.

[17]  29 U.S.C. § 1432(b)(1); IRC § 432(k)(3).

especially the imposition of increased contribution rates on employers.[18] By statute, a plan ceases to be in critical and declining status after the plan year in which a plan terminates by mass withdrawal,[19] which occurs when every employer permanently ceases to have an obligation to contribute.[20]

The Fund terminated by mass withdrawal in PY2016.[21] Lacking employer contributions from PY2016 until PY2021, the Fund became insolvent in September 2023. Since then, PBGC has provided financial assistance to enable the Fund to pay the estimated 53% of Fund benefits, on average, that ERISA guarantees. PBGC must continue providing such financial assistance indefinitely.

In September 2022, the Fund applied for $132,250,472 in SFA.[22] It claimed to be "in critical and declining status," notwithstanding termination, because it allegedly had just been "restored" by the return of one employer, which began contributing approximately $90,000 per year under a newly amended collective bargaining agreement.[23] PBGC has no record, in the 50 years since ERISA's

---

[18]  *See* 29 U.S.C. § 1085; IRC § 432.

[19]  29 U.S.C. § 1081(c) (minimum funding and zone-status provisions stop applying); IRC § 412(e)(4) (minimum funding stops applying). The IRS has informed PBGC that IRC § 432, which generally parallels 29 U.S.C. § 1085, does not apply after the PY of termination by mass withdrawal.

[20]  29 U.S.C. §§ 1341a(a)(2), 1383(a).

[21]  J.A. 63.

[22]  *See* J.A. 64-600.

[23]  J.A. 537, 636 ¶ 9.

enactment, of an employer and union agreeing to contribute to a terminated multiemployer plan, which entails employer liability for the plan's underfunding and, for union members, an allocation from their wage package to a wasting trust when they could instead bargain for higher wages or contributions to a financially sound employee benefit plan.

ERISA prohibits restoration of a multiemployer plan terminated by mass withdrawal and therefore blocks the route to eligibility that the Fund attempted to engineer.[24] Accordingly, PBGC denied the Fund's SFA application for ineligibility.[25]

The Fund sued to set aside the denial. In a detailed, 20-page opinion, the district court entered summary judgment for PBGC,[26] agreeing that ERISA prohibits restoration of a multiemployer plan terminated by mass withdrawal.[27]

On appeal, the Fund argued that (1) its actuary's determination of critical and declining status in PY2021 is dispositive; (2) 29 U.S.C. § 1432(b)(1)(A) does not expressly exclude a "previously terminated" plan from obtaining SFA based on

---

[24] *See* PBGC Br. 16-38, Dkt. 42.

[25] J.A. 42-43.

[26] S.A. 21, Dkt. 37.

[27] S.A. 17.

critical and declining status; and (3) the plan could be and was restored, making its termination irrelevant.[28]

The panel ruled for the Fund on a basis never argued by the Fund. Following oral argument, the panel directed the parties to file supplemental letter briefs on "whether terminated plans that have not been restored qualify for [SFA] under [ARP]" and specifically on "the eligibility of terminated plans under 29 U.S.C. § 1432(b)(1)(A) in light of that subsection's incorporation by reference of the definition found in 29 U.S.C. § 1085(b)(6)."[29] The panel concluded that the Fund was eligible for SFA based on critical and declining status because "[b]y using the phrase 'within the meaning of section 1085(b)(6),' § 1432(b)(1)(A), the SFA statute incorporates by reference only the definition [of critical and declining status] contained in § 1085(b)(6)" but not "external limitations on § 1085's operation, such as the limitation contained in § 1081(c)."[30] That conclusion did not address the issue on appeal—whether ERISA prohibits restoration of a multiemployer plan terminated by mass withdrawal.[31]

---

[28]  Fund Br. 21-35, Dkt. 32; Fund Reply Br. 9-17, Dkt. 50.

[29]  Dkt. 60.

[30]  Op. 10.

[31]  Fund Br. 5, Dkt. 32.

The panel reversed summary judgment for PBGC and directed summary judgment for the Fund.

### ARGUMENT FOR REHEARING

**I.     29 U.S.C. § 1432(b)(1)(A) unambiguously limits SFA to plans that were actually "in critical and declining status" between 2020 and 2022, and because it terminated in 2016, the Fund was not in critical and declining status in those years.**

29 U.S.C. § 1432(b)(1)(A) provides that a plan will be eligible for SFA if it "is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022." Section 1085(b)(6), which contains the definition of critical and declining status, is part of ERISA's plan funding rules and is specifically governed by 29 U.S.C. § 1081(c), also a provision of ERISA's plan funding rules: "This part applies, with respect to a terminated multiemployer plan to which section 1321 of this title applies, until the last day of the plan year in which the plan terminates . . . ." The definition in 29 U.S.C. § 1085(b)(6) refers to a provision in ERISA's funding rules and is subject to the exclusions set forth in those rules.

When Congress cross-referenced 29 U.S.C. § 1085(b)(6) under 29 U.S.C. § 1432(b)(1)(A), it referenced a provision that has long been limited to plans that had not previously terminated. The panel did not, and cannot, point to any indication that Congress intended to alter this interpretation. Indeed, it is clear that

Congress *did not* intend that a terminated plan be eligible for SFA under 29 U.S.C. § 1432(b)(1)(A).

It is undisputed that the Fund terminated in 2016. Accordingly, under 29 U.S.C. § 1081(c), the Fund was not, and could not have been, in critical and declining status for purposes of 29 U.S.C. § 1432(b)(1)(A) between 2020 and 2022.

**II.    IRC § 432(k)(3)(A)(i) makes clear that a plan is eligible for SFA based on critical and declining status only if actually "in critical and declining status."**

The panel's opinion ignores Congress's reiteration of the SFA eligibility test under IRC § 432(k)(3)(A)(i).  The panel held that a plan is eligible for SFA if "critical and declining status (*within the meaning of* [29 U.S.C. § 1085(b)(6)]) in any plan year beginning in 2020 through 2022)" even if not in critical and declining status *under* section 1085.[32] Reading 29 U.S.C. § 1432(b)(1)(A) together with the parallel eligibility provision under IRC § 432(k)(3)(A) gives the opposite conclusion, and rehearing should be granted to correct this serious error. A rehearing would allow the parties to address the panel's misapprehensions that:

---

[32]    Op. 5, 7-12 (quoting 29 U.S.C. § 1432(b)(1)(A)).

1) the SFA provisions in ERISA constitute a standalone "SFA statute"[33] separate from section 1085(b)(6), which is mirrored in IRC § 432(b)(6),[34] instead of each provision being integrated into ERISA;

2) only one SFA provision determines eligibility test for plans in critical declining status[35] (29 U.S.C. § 1432(b)(1)(A), the Title IV Eligibility Test), overlooking the iteration of the same test in IRC § 432(k)(3)(A)(i) (the Title II Eligibility Test);

3) Congress did not codify SFA eligibility in Title II so "*the* words that Congress chose to codify eligibility for SFA do not support a per se exclusion of terminated plans under § 1432(b)(1)(A);"[36] and

4) the panel misapplied the canon for the construction of reference statutes, which isolated 29 U.S.C. § 1085(b)(6) from the rest of ERISA.

The Supreme Court has described ERISA as a "comprehensive and reticulated statute."[37] The statute is codified in four titles, and administration of ERISA is

---

[33]  Op. 3, 5, 7, 9-11.

[34]  *Id.* 10.

[35]  Op. 3.

[36]  *Id.* 13 (emphasis added).

[37]  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal citations and quotations omitted).

allocated to three agencies. The complex provisions of ERISA's four titles, and the associated regulations and activities of the ERISA agencies, are like an integrated network which must be read together as a whole.

Finding a statute's meaning "is a holistic endeavor," in which a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ."[38] To the extent that 29 U.S.C. § 1432(b)(1)(A),which falls under Title IV of ERISA, is unclear, IRC § 432(k)(3)(A)(i)—which falls under Title II—clarifies this restriction.

In the Title II Eligibility Test, Congress specified that SFA eligibility based on critical and declining status requires that the plan be "in critical and declining status in any plan year beginning in 2020 through 2022." There is no cross-reference to another provision of ERISA: Congress did *not* make eligible a plan "in critical and declining status" *within the meaning of* section 432(b)(6) or, under the panel's interpretation, "clone" the definition of "in critical and declining status," such that the plan need only meet the elements of the definition. Rather, it made eligible a plan actually "in critical and declining status" under section 432 in a plan

---

[38] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631 (1973) ("It is well established that a court's task in interpreting separate provisions of a single Act is to give the Act the most harmonious, comprehensive meaning possible.") (cleaned up).

year beginning in 2020 through 2022. Thus, even if 29 U.S.C. § 1432(b)(1)(A) could be read to make a terminated plan eligible for SFA, the Title II Eligibility Test shows that Congress did not intend that result.

The panel presumed that Congress intended not to employ phrasing that requires the plan to have actually been in critical and declining status under section 1085(b)(6), such as "for purposes of section 1085(b)(6)" or "to which section 1085(b)(6) of this title applies."[39] By disregarding the Title II Eligibility Test, the panel contradicted Congress's manifest intent.

The panel may have misapprehended the Title IV Eligibility Test to be "*the pertinent provision*"[40] and the Title II Eligibility Test (and PBGC's argument based thereon[41]) to be irrelevant because IRC § 432(k)(3)(A) defines SFA eligibility "[f]or purposes of this section." But every purpose for which SFA eligibility is defined under IRC § 432 is either identical to, or consonant with, the purposes under 29 U.S.C. § 1432. *Both* provisions are therefore pertinent.[42]

Moreover, if the Court treats 29 U.S.C. § 1432(b)(1)(A) as requiring only that a plan meet the definition of critical and declining status cleaved from its

---

[39] Op. 11-12.

[40] Op. 3.

[41] PBGC's Supp. Br. 2-6.

[42] *Compare, e.g.,* IRC § 432(k)(2)(A)-(C) (imposing conditions on eligible plans) *with* U.S.C. § 1432(k)-(m) (same).

statutory context, confounding consequences ensue. For example, the section 432 zone status rules do not apply to plans created after July 16, 2006. Section 432(a)(4) also exempts post-2006 plans from most of section 432's SFA provisions, including eligibility. The panel's decision would make eligible a post-2006 plan for SFA as a plan in critical and declining status (for purposes of 29 U.S.C. § 1085(b)(6)) despite not being in that status within the meaning of IRC § 432(a)(3). And that plan would be exempt from section 432's requirement that taxpayer-funded SFA payments be disregarded in determining minimum employer contributions, a provision intended to promote employer funding. The panel's decision would create an inexplicable result that Congress could not have intended.

The panel stated that "Congress also knew how to exclude terminated plans expressly—which it did in one of the other SFA eligibility provisions. *See* 29 U.S.C. § 1432(b)(1)(D) (a plan is eligible for SFA if it 'became insolvent . . . and has remained so insolvent *and has not been terminated as of March 11, 2021*' (emphasis added)). The fact that Congress chose not to include a similar limitation in subparagraph (A), the provision at issue here, is telling."[43] But Congress did not need to specify that terminated plans were excluded because it had excluded terminated plans by operation of law.

---

[43] Op. 12.

### III. The panel relied on a canon of construction that does not apply to substantive interpretation of statutory language.

In interpreting the Title IV Eligibility Test, the panel relied on a "[c]onstruction of reference statutes" canon described in 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 51:8 (7th ed. rev. Aug. 2012).[44] A reference statute "adopts the terms of another act without restating them." It incorporates by reference part or all of the other, referenced statute. *Id.* 51:7

The canon dictates that in a case where there is an "adoption by reference to limited and particular provisions of another statute . . . the reference does not include subsequent amendments." *Id.* The panel erroneously relied on this canon that stands for the proposition that such incorporated references do not reflect subsequent changes. The issue here is whether Congress's reference to a specific provision that, by design, did not include terminated plans at the time of the reference, should nevertheless be read to encompass them without any evidence of Congressional intent to that effect.

The panel misapplied the canon when it concluded that the specific reference to 29 U.S.C. § 1085(b)(6) in IRC 432(k)(3)(A) means that 29 U.S.C. § 1085(b)(6)

---

[44] Op. 10.

must be read in isolation from the rest of ERISA. Rather, it means only that subsequent amendments to 29 U.S.C. § 1085(b)(6) (were there to be any) would not be incorporated into the Title IV Eligibility Test.

The panel also misread *Jam v. International Finance Corporation*, 586 U.S. 199 (2019). In *Jam*, the Court stated: "[a] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute *as it existed when the referring statute was enacted, without any subsequent amendments*."[45] In quoting that language, the panel omitted the italicized text, mistakenly suggesting that *Jam* supports the proposition that a cross-referenced statutory provision must be read in isolation, that the reference statute incorporates the "text and nothing else."[46]

"[Courts] do not, however, construe statutory phrases in isolation; [courts] read statutes as a whole."[47] By reading 29 U.S.C. § 1085(b)(6) in isolation, the panel overlooked the "context provided by the rest of the statute."[48] Statutory

---

[45] *Jam*, 586 U.S. at 209 (emphasis added).

[46] Op. 10.

[47] *U.S. v. Morton*, 467 U.S. 822, 828 (1984).

[48] *Keen v. Helson* 930 F.3d 799, 803 (6th Cir. 2019).

interpretation is "a holistic endeavor" in which the structure and wording of other parts of a statute can help clarify the meaning of an isolated term.[49]

Moreover, when the panel held that the language to which "another statute" refers must be read in isolation, it did not recognize that the relevant provision here is part of the same statute, ERISA. As the Supreme Court explained in *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631 (1973), "[i]t is well established that a court's task in interpreting separate provisions of a single Act is to give the Act the most harmonious, comprehensive meaning possible."

By reading 29 U.S.C. § 1085(b)(6) in isolation, the panel concluded that terminated plans are eligible for SFA under section 1432(b)(1)(A). A holistic reading of ERISA and 29 U.S.C. § 1085(b)(6) in context shows that a plan terminated by mass withdrawal is not subject to ERISA's funding and funding-zone-status provisions in a subsequent plan year and therefore cannot be eligible for SFA based on its funding-zone status in a subsequent plan year. The panel's misconstruction would make billions of taxpayer dollars available to terminated plans that are ineligible under ERISA's plain text.

---

[49] *Timbers*, 484 U.S. at 371; *Keen* at 803.

# CONCLUSION

PBGC respectfully requests rehearing. The panel's decision has implications for whether other terminated plans are eligible for SFA, including an estimated 100 insolvent plans that receive regular financial assistance from PBGC and that Congress excluded from eligibility under 29 U.S.C. § 1432(b)(1)(D), which makes eligible a plan that "became insolvent . . . after December 16, 2014, and has remained so insolvent and has not been terminated as of March 11, 2021." An estimated 100 insolvent plans that became insolvent by December 16, 2014, had terminated by March 11, 2021, or both. Those and some 30 other plans could become eligible under the panel's interpretation of ERISA, costing billions of taxpayer dollars. Rehearing would allow correction of clear legal error and avoidance of collateral consequences.

Dated: June 18, 2025
Washington, DC

Respectfully submitted,
/s/ Benjamin Kelly

Karen L. Morris, General Counsel
Daniel S. Liebman, Deputy General Counsel
John Ginsberg, Assistant General Counsel
Benjamin Kelly, Deputy Asst Gen. Counsel
Emily Allender, Attorney

Pension Benefit Guaranty Corporation
445 12th Street, S.W.
Washington, D.C. 20024-2101
Telephone: (202) 229-3714
Email: kelly.benjamin@pbgc.gov &
efile@pbgc.gov

**Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1. This document complies with the principal brief limit of Fed. R. App. P. 32(a)(7)(B),
   and the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the
   document exempted by Fed. R. App. P. 32(f),

   this document contains 3,885 words which include footnotes.

   this brief uses a monospaced typeface and contains [*state the number of*] lines of
   text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and
   the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   this document has been prepared in a proportionally spaced typeface using
   Microsoft Word in Times New Roman 14-point font

   this document has been prepared in a monospaced typeface using [*state name and
   version of word-processing program*] with [*state number of characters per inch
   and name of type style*].

     /s/ Benjamin T. Kelly_____

Attorney for:

     Pension Benefit Guaranty Corp

Dated: June 18, 2025

## CERTIFICATE OF SERVICE

I certify that on June 18, 2025, I electronically filed the Brief for the Defendant-Appellee, and that all parties in the case are represented by registered CM/ECF users.

I further certify that, on the same day, a PDF copy of this brief was emailed to the Court and to opposing counsel. I further certify that 15 paper copies of the brief will be mailed on June 20, 2025 to the Court by UPS.

/s/ Benjamin T. Kelly
Benjamin T. Kelly
Pension Benefit Guaranty Corporation
445 12st Street SW
Washington, D.C. 20024-2101
Telephone: (202) 229-3714
Email: kelly.benjamin@pbgc.gov &
efile@pbgc.gov

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2024
Argued:  December 12, 2024
Decided:  April 29, 2025

---

No. 23-7868

---

BOARD OF TRUSTEES OF THE
BAKERY DRIVERS LOCAL 550
AND INDUSTRY PENSION FUND,
*Plaintiff-Appellant*,
v.
PENSION BENEFIT GUARANTY CORPORATION,
*Defendant-Appellee*.

---

Appeal from the United States District Court
for the Eastern District of New York
Docket No. 2:23-cv-1595, Joan M. Azrack, *District Judge*.

---

Before:  ROBINSON, PÉREZ, and NATHAN, *Circuit Judges*.

This case requires us to interpret an eligibility provision in the statute establishing the Special Financial Assistance ("SFA") program, a temporary program created by Congress in 2021 to help struggling multiemployer pension plans.  Plaintiff-Appellant, which sponsors a multiemployer plan primarily benefitting unionized bakery drivers in New York City ("the Fund"), applied for SFA in 2022, asserting that it was "in critical and declining status" and thus eligible under the statute.  29 U.S.C. § 1432(b)(1)(A).  The Pension Benefit Guaranty Corporation ("PBGC"), the agency responsible for administering the program, found that the Fund's termination in 2016 made it ineligible.  The Fund sued under

the Administrative Procedure Act, and the district court granted summary judgment for the PBGC.  The Fund now appeals.

Because we do not read the pertinent provision of the SFA statute to exclude plans based solely on a prior termination, we **REVERSE** the judgment of the district court and **REMAND** with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

————————————————————

JEREMY P. BLUMENFELD, Morgan, Lewis & Bockius LLP, Philadelphia, PA, *for Plaintiff-Appellant.*

Douglas A. Hastings and Brendan J. Anderson (*on the briefs*), Morgan, Lewis & Bockius LLP, Washington, DC, *for Plaintiff-Appellant.*

JOHN H. GINSBERG (Karen L. Morris, Daniel Liebman, Benjamin T. Kelly, and Emily J. Allender, *on the briefs*), Pension Benefit Guaranty Corporation, Washington, DC, *for Defendant-Appellee.*

————————————————————

MYRNA PÉREZ, *Circuit Judge*:

This case requires us to interpret an eligibility provision in the statute establishing the Special Financial Assistance ("SFA") program, a temporary program created by Congress in 2021 to help struggling multiemployer pension plans.  Plaintiff-Appellant, which sponsors a multiemployer plan primarily benefitting unionized bakery drivers in New York City ("the Fund"),[1] applied for

---

[1] For simplicity, we use "the Fund" to refer interchangeably to the plan and its sponsor.

SFA in 2022, asserting that it was "in critical and declining status" and thus eligible under the statute. 29 U.S.C. § 1432(b)(1)(A). The Pension Benefit Guaranty Corporation ("PBGC"), the agency responsible for administering the program, found that the Fund's termination in 2016 made it ineligible. The Fund sued under the Administrative Procedure Act ("APA"), and the district court granted summary judgment for the PBGC. The Fund now appeals.

Because we do not read the pertinent provision of the SFA statute to exclude plans based solely on a prior termination, we REVERSE the judgment of the district court and REMAND with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

## BACKGROUND

### I.  The Fund's Termination

The Fund was created in 1955 by an agreement between several large bakeries and the Bakery Drivers Union Local 550. It is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") and ERISA's implementing regulations. In 2011, the Fund's largest employer, Hostess Brands, Inc., stopped making contributions. Hostess declared bankruptcy in 2012, and its liability to the

3

Fund was eventually discharged in 2015. In 2016, facing insolvency, the Fund reached an agreement with its four remaining employers to transfer some of their members to a newly created pension plan. Those employers were then relieved of their obligations to continue contributing to the Fund, triggering the Fund's termination by mass withdrawal under ERISA. *See* 29 U.S.C. § 1341a(a)(2) ("[T]he withdrawal of every employer from the plan[] . . . or the cessation of the obligation of all employers to contribute under the plan" will cause a multiemployer plan to terminate); 29 C.F.R. § 4041A.1 (labeling this a "terminat[ion] by mass withdrawal").

Despite its connotation, a "termination" of this kind does not mark the end of a plan's operations. In the succeeding years, the Fund continued to perform audits, conduct valuations, file annual reports, and make payments to more than 1,100 beneficiaries. *See* 29 U.S.C. § 1341a(c), (d), (f) (obligating multiemployer plans terminated by mass withdrawal to continue paying benefits); 29 C.F.R. §§ 4041A.21–.27 (requiring these plans to, among other things, pay certain benefits, collect withdrawal liabilities, conduct actuarial valuations, periodically assess plan solvency, and seek financial assistance from the PBGC when necessary).

In September 2022, hoping to ensure the Fund's eligibility under the newly enacted SFA program, a former employer—Bimbo Bakeries USA—agreed to rejoin the Fund and resume contributions on behalf of its then-current employees. The Fund became insolvent about a year later.

## II. The Fund's Application for Special Financial Assistance

Congress established the SFA program in the American Rescue Plan Act of 2021, Pub. L. 117-2, § 9704, 135 Stat. 4, 190. Under the SFA statute, the PBGC must grant assistance to all eligible multiemployer plans, including plans that were "in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022." 29 U.S.C. § 1432(b)(1)(A). Of the three financial statuses defined in 29 U.S.C. § 1085, "critical and declining" is the direst.

In September 2022, shortly after reenlisting Bimbo Bakeries, the Fund applied for assistance under the SFA program, asserting that it was in critical and declining status and thus qualified for SFA under § 1432(b)(1)(A). The PBGC rejected the application, finding that the Fund could not be "in critical and declining status" because it "has had no zone status since plan year 2016, when the Plan terminated by mass withdrawal." J. App'x at 42 (Letter from then-PBGC

5

Director Gordon Hartogensis to the Fund).  The reenlistment of Bimbo Bakeries made no difference, it concluded, because "ERISA contains no provision allowing a multiemployer plan that terminated by mass withdrawal under section 4041A to be restored."  *Id.*  The PBGC did not indicate that it had any other reason to reject the application.

## III.    Procedural History

The Fund brought this APA action in the Eastern District of New York, claiming, among other things, that the PBGC's denial of its application was contrary to law.  Both parties moved for summary judgment, raising two questions of statutory interpretation: (1) whether § 1432(b)(1)(A), the SFA eligibility provision at issue, per se excludes multiemployer plans that previously terminated by mass withdrawal; and (2) whether ERISA permits such plans to be restored.  The district court sided with the PBGC on both issues, concluding that a multiemployer plan that had been terminated by mass withdrawal could neither claim SFA funding under § 1432(b)(1)(A) nor restore itself.  *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. PBGC*, No. 23-cv-1595, 2023 WL 7091862, at *4–5, 9 & n.12 (E.D.N.Y. Oct. 26, 2023).

The court consequently denied the Fund's motion for summary judgment, granted summary judgment for the PBGC, and affirmed the PBGC's denial of the Fund's SFA application. *Id.* at *11. This appeal followed.

## STANDARD OF REVIEW

"On appeal from a grant of summary judgment in a challenge to agency action under the APA, we review the administrative record and the district court's decision *de novo.*" *Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 73 (2d Cir. 2022) (internal quotation marks omitted). When interpreting a federal statute—including a statute that a defendant agency is charged with administering—we must "exercise independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). If the agency's final action does not accord with the statute as we interpret it, the APA requires that the action be "set aside." 5 U.S.C. § 706(2)(A).

## DISCUSSION

We begin with the text of the SFA statute. Under 29 U.S.C. § 1432(b)(1)(A), the PBGC must grant assistance to a multiemployer plan that "is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan

7

year beginning in 2020 through 2022."[2]  Section 1085(b)(6), in turn, defines "critical

and declining status" as follows:

> For purposes of this section, a plan in critical status shall
> be treated as in critical and declining status if the plan is
> described in one or more of subparagraphs (A), (B), (C),
> and (D) of paragraph (2) and the plan is projected to
> become insolvent within the meaning of section 1426 of
> this title during the current plan year or any of the 14
> succeeding plan years . . . .

29 U.S.C. § 1085(b)(6).  The subparagraphs referenced in § 1085(b)(6) describe a

plan's financial condition in terms of the projected value of its assets compared to

its projected liabilities.  For example, subparagraph (D) provides the following:

> A plan is described in this subparagraph if the sum of—
>
> (i) the fair market value of plan assets, plus
>
> (ii) the present value of the reasonably anticipated
> employer contributions for the current plan year and
> each of the 4 succeeding plan years, assuming that the
> terms of all collective bargaining agreements
> pursuant to which the plan is maintained for the
> current plan year continue in effect for succeeding
> plan years,

---

[2] For ease of reference, we refer to and quote the statutes as they appear in the United States Code.  Because Title 29 of the U.S. Code is not a "positive law" title—meaning that Congress has not enacted the compilation itself into law—the authoritative versions are those that appear in the Statutes at Large.  *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 448 & n.3 (1993).  But besides making the statutory cross-references easier to follow, the textual differences introduced by the compilers of the U.S. Code are inconsequential and do not affect our analysis.  *Compare, e.g.*, American Rescue Plan Act of 2021 § 9704, 135 Stat. at 190 ("within the meaning of section 305(b)(6) [of ERISA]"), *with* 29 U.S.C. § 1432(b)(1)(A) ("within the meaning of section 1085(b)(6) of this title").

> is less than the present value of all benefits projected to
> be payable under the plan during the current plan year
> and each of the 4 succeeding plan years (plus
> administrative expenses for such plan years).

*Id.* § 1085(b)(2)(D).  Section 1085(b)(6) also references the definition of insolvency

in 29 U.S.C. § 1426, which provides that "a multiemployer plan is insolvent if the

plan's available resources are not sufficient to pay benefits under the plan when

due for the plan year."  *Id.* § 1426(b)(1).

These provisions do not, by their terms, exclude a plan that was terminated

by mass withdrawal (that is, a plan that had at one time stopped receiving

employer contributions).  The PBGC does not dispute that such a plan could meet

these criteria, nor does it dispute that the Fund meets them here.

Instead, the PBGC points to 29 U.S.C. § 1081(c), which provides that Part 3

of Subchapter I of ERISA—which includes § 1085 but not the SFA statute—

"applies, with respect to a terminated multiemployer plan," only "until the last

day of the plan year in which the plan terminates."  For example, when a plan in

critical and declining status terminates, it is only required to continue

implementing a rehabilitation plan, as required by § 1085(a)(3)(A), through the

end of that year.  The PBGC argues that § 1081(c) applies to the status definitions

in § 1085 as well as its requirements.  And because the Fund terminated in 2016,

the PBGC argues, it could not have a "status" under § 1085 in the 2020, 2021, or 2022 plan years, making it ineligible under § 1432(b)(1)(A).

We disagree.  Section 1081(c) does not apply to the SFA statute, which is located in a different part of a different subchapter.  Nor does it apply by virtue of its application to § 1085.  By using the phrase "within the meaning of section 1085(b)(6)," *id.* § 1432(b)(1)(A), the SFA statute incorporates by reference only the definition contained in § 1085(b)(6).  It does not incorporate external limitations on § 1085's operation, such as the limitation contained in § 1081(c).[3]  "[A] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute," meaning that it incorporates its text and nothing else.  *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209 (2019); *see also* 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 51:8 (7th ed. rev. Aug. 2012) ("A statute of specific reference adopts only the particular parts of the statute to which it refers."); *id.* § 51:7 ("[W]here a statute refers specifically to another statute by title or section number, there is no reason to think its drafters meant to incorporate more than the provision specifically referred to." (alteration in original) (internal quotation marks omitted)).

---

[3] We assume without deciding that § 1081(c) limits the applicability of the status definitions contained within § 1085 and not just the requirements imposed by § 1085.

10

The legal force of an incorporated reference derives from the statute making the reference, not from the document being incorporated. *See Interstate Consol. St. Ry. Co. v. Massachusetts*, 207 U.S. 79, 84–85 (1907) (Holmes, J.). This is because an incorporated provision "exists not as any part of the referenced material itself, but rather as a duplicate or 'clone' of the referenced material that has been created within the adopting legislation." F. Scott Boyd, *Looking Glass Law: Legislation by Reference in the States*, 68 La. L. Rev. 1201, 1221 (2008). So "it [does] not matter what [the incorporated statute's] own nature or effect might be"—in this case, the nature or effect of § 1085(b)(6)—"as the force given to it by reference and incorporation [is] derived wholly from the [law incorporating it]." *Interstate*, 207 U.S. at 84–85. Any limitation that § 1081(c) might place on § 1085(b)(6)'s operation would not affect the operation of § 1085(b)(6)'s "clone" within the SFA statute. Boyd, *supra*, at 1221.

Moreover, if Congress had wanted to incorporate the various limitations on § 1085's applicability, along with its definition, it could have used a phrase such as "for purposes of section 1085(b)(6)" or "to which section 1085(b)(6) of this title applies"—phrasing that it did use in other parts of the same SFA section. *See* 29 U.S.C. § 1432(b)(1)(D) (a plan is eligible if "the plan became insolvent *for purposes*

11

*of section 418E of title 26* after December 16, 2014 . . . ." (emphasis added)); *id.* § 1432(f) ("Any application by a plan for special financial assistance under this section shall be submitted to the corporation (and, in the case of a plan *to which section 432(k)(1)(D) of title 26 applies*, to the Secretary of the Treasury) no later than December 31, 2025 . . . ." (emphasis added)).  Because Congress chose to use different language—"within the meaning of"—when referring to § 1085(b)(6), "we presume its word choice was intentional," *Hirt v. Equitable Ret. Plan for Emps., Managers & Agents*, 533 F.3d 102, 108 (2d Cir. 2008) (internal quotation marks omitted).

Congress also knew how to exclude terminated plans expressly—which it did in one of the other SFA eligibility provisions.  *See* 29 U.S.C. § 1432(b)(1)(D) (a plan is eligible for SFA if it "became insolvent . . . and has remained so insolvent *and has not been terminated as of March 11, 2021*" (emphasis added)).  The fact that Congress chose not to include a similar limitation in subparagraph (A), the provision at issue here, is telling.

Finally, the PBGC asserts that permitting terminated plans to apply for SFA funding "would severely challenge PBGC's ability to process the applications of all eligible plans within the tight statutory deadlines."  PBGC Suppl. Br. at 8, Dkt.

12

62.1.  While we are sympathetic to these difficulties, "[i]t is Congress's job to craft policy and ours to interpret the words that codify it."  *Lackey v. Stinnie*, 145 S. Ct. 659, 669 (2025).  And the words that Congress chose to codify eligibility for SFA do not support a per se exclusion of terminated plans under § 1432(b)(1)(A).[4]  The PBGC acted contrary to law when it concluded otherwise and denied the Fund's SFA application on that basis.[5]

## CONCLUSION

The judgment of the district court is REVERSED and the case is REMANDED with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

---

[4] The PBGC also estimates that our reading will result in a significantly greater number of SFA-eligible plans than the Congressional Budget Office ("CBO") estimated.  Even if we were inclined to consider these extra-record calculations, the complete absence of data or methodological detail accompanying the PBGC's estimates prevents us from doing so meaningfully.  In any event, we are reluctant to infer congressional intent from a CBO projection, particularly when such an inference would contradict the plain text of the statute Congress enacted.

[5] Because we conclude that § 1432(b)(1)(A) does not exclude terminated plans per se, we need not decide whether ERISA permits a terminated multiemployer plan to be restored.