23-7868
Bd. of Trs. of the Bakery Drivers Loc. 550 et al. v. Pension Benefit Guar. Corp.

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2024

Argued: December 12, 2024

Decided: April 29, 2025

No. 23-7868

---

BOARD OF TRUSTEES OF THE
BAKERY DRIVERS LOCAL 550
AND INDUSTRY PENSION FUND,
*Plaintiff-Appellant*,

v.

PENSION BENEFIT GUARANTY CORPORATION,
*Defendant-Appellee*.

---

Appeal from the United States District Court
for the Eastern District of New York
Docket No. 2:23-cv-1595, Joan M. Azrack, *District Judge*.

---

Before: ROBINSON, PÉREZ, and NATHAN, *Circuit Judges*.

    This case requires us to interpret an eligibility provision in the statute establishing the Special Financial Assistance ("SFA") program, a temporary program created by Congress in 2021 to help struggling multiemployer pension plans. Plaintiff-Appellant, which sponsors a multiemployer plan primarily benefitting unionized bakery drivers in New York City ("the Fund"), applied for SFA in 2022, asserting that it was "in critical and declining status" and thus eligible under the statute. 29 U.S.C. § 1432(b)(1)(A). The Pension Benefit Guaranty Corporation ("PBGC"), the agency responsible for administering the program, found that the Fund's termination in 2016 made it ineligible. The Fund sued under

the Administrative Procedure Act, and the district court granted summary judgment for the PBGC. The Fund now appeals.

Because we do not read the pertinent provision of the SFA statute to exclude plans based solely on a prior termination, we **REVERSE** the judgment of the district court and **REMAND** with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

---

> JEREMY P. BLUMENFELD, Morgan, Lewis & Bockius LLP, Philadelphia, PA, *for Plaintiff-Appellant*.
>
> Douglas A. Hastings and Brendan J. Anderson (*on the briefs*), Morgan, Lewis & Bockius LLP, Washington, DC, *for Plaintiff-Appellant*.
>
> JOHN H. GINSBERG (Karen L. Morris, Daniel Liebman, Benjamin T. Kelly, and Emily J. Allender, *on the briefs*), Pension Benefit Guaranty Corporation, Washington, DC, *for Defendant-Appellee*.

---

MYRNA PÉREZ, *Circuit Judge*:

This case requires us to interpret an eligibility provision in the statute establishing the Special Financial Assistance ("SFA") program, a temporary program created by Congress in 2021 to help struggling multiemployer pension plans. Plaintiff-Appellant, which sponsors a multiemployer plan primarily benefitting unionized bakery drivers in New York City ("the Fund"),[1] applied for

---

[1] For simplicity, we use "the Fund" to refer interchangeably to the plan and its sponsor.

2

SFA in 2022, asserting that it was "in critical and declining status" and thus eligible under the statute. 29 U.S.C. § 1432(b)(1)(A). The Pension Benefit Guaranty Corporation ("PBGC"), the agency responsible for administering the program, found that the Fund's termination in 2016 made it ineligible. The Fund sued under the Administrative Procedure Act ("APA"), and the district court granted summary judgment for the PBGC. The Fund now appeals.

Because we do not read the pertinent provision of the SFA statute to exclude plans based solely on a prior termination, we REVERSE the judgment of the district court and REMAND with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

## BACKGROUND

### I. The Fund's Termination

The Fund was created in 1955 by an agreement between several large bakeries and the Bakery Drivers Union Local 550. It is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") and ERISA's implementing regulations. In 2011, the Fund's largest employer, Hostess Brands, Inc., stopped making contributions. Hostess declared bankruptcy in 2012, and its liability to the

3

Fund was eventually discharged in 2015. In 2016, facing insolvency, the Fund reached an agreement with its four remaining employers to transfer some of their members to a newly created pension plan. Those employers were then relieved of their obligations to continue contributing to the Fund, triggering the Fund's termination by mass withdrawal under ERISA. *See* 29 U.S.C. § 1341a(a)(2) ("[T]he withdrawal of every employer from the plan[] . . . or the cessation of the obligation of all employers to contribute under the plan" will cause a multiemployer plan to terminate); 29 C.F.R. § 4041A.1 (labeling this a "terminat[ion] by mass withdrawal").

Despite its connotation, a "termination" of this kind does not mark the end of a plan's operations. In the succeeding years, the Fund continued to perform audits, conduct valuations, file annual reports, and make payments to more than 1,100 beneficiaries. *See* 29 U.S.C. § 1341a(c), (d), (f) (obligating multiemployer plans terminated by mass withdrawal to continue paying benefits); 29 C.F.R. §§ 4041A.21–.27 (requiring these plans to, among other things, pay certain benefits, collect withdrawal liabilities, conduct actuarial valuations, periodically assess plan solvency, and seek financial assistance from the PBGC when necessary).

4

In September 2022, hoping to ensure the Fund's eligibility under the newly enacted SFA program, a former employer—Bimbo Bakeries USA—agreed to rejoin the Fund and resume contributions on behalf of its then-current employees. The Fund became insolvent about a year later.

## II. The Fund's Application for Special Financial Assistance

Congress established the SFA program in the American Rescue Plan Act of 2021, Pub. L. 117-2, § 9704, 135 Stat. 4, 190. Under the SFA statute, the PBGC must grant assistance to all eligible multiemployer plans, including plans that were "in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022." 29 U.S.C. § 1432(b)(1)(A). Of the three financial statuses defined in 29 U.S.C. § 1085, "critical and declining" is the direst.

In September 2022, shortly after reenlisting Bimbo Bakeries, the Fund applied for assistance under the SFA program, asserting that it was in critical and declining status and thus qualified for SFA under § 1432(b)(1)(A). The PBGC rejected the application, finding that the Fund could not be "in critical and declining status" because it "has had no zone status since plan year 2016, when the Plan terminated by mass withdrawal." J. App'x at 42 (Letter from then-PBGC

5

Director Gordon Hartogensis to the Fund). The reenlistment of Bimbo Bakeries made no difference, it concluded, because "ERISA contains no provision allowing a multiemployer plan that terminated by mass withdrawal under section 4041A to be restored." *Id.* The PBGC did not indicate that it had any other reason to reject the application.

### III. Procedural History

The Fund brought this APA action in the Eastern District of New York, claiming, among other things, that the PBGC's denial of its application was contrary to law. Both parties moved for summary judgment, raising two questions of statutory interpretation: (1) whether § 1432(b)(1)(A), the SFA eligibility provision at issue, per se excludes multiemployer plans that previously terminated by mass withdrawal; and (2) whether ERISA permits such plans to be restored. The district court sided with the PBGC on both issues, concluding that a multiemployer plan that had been terminated by mass withdrawal could neither claim SFA funding under § 1432(b)(1)(A) nor restore itself. *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. PBGC*, No. 23-cv-1595, 2023 WL 7091862, at *4–5, 9 & n.12 (E.D.N.Y. Oct. 26, 2023).

6

The court consequently denied the Fund's motion for summary judgment, granted summary judgment for the PBGC, and affirmed the PBGC's denial of the Fund's SFA application. *Id.* at *11. This appeal followed.

## STANDARD OF REVIEW

"On appeal from a grant of summary judgment in a challenge to agency action under the APA, we review the administrative record and the district court's decision *de novo*." *Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 73 (2d Cir. 2022) (internal quotation marks omitted). When interpreting a federal statute—including a statute that a defendant agency is charged with administering—we must "exercise independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). If the agency's final action does not accord with the statute as we interpret it, the APA requires that the action be "set aside." 5 U.S.C. § 706(2)(A).

## DISCUSSION

We begin with the text of the SFA statute. Under 29 U.S.C. § 1432(b)(1)(A), the PBGC must grant assistance to a multiemployer plan that "is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan

7

year beginning in 2020 through 2022."[2] Section 1085(b)(6), in turn, defines "critical and declining status" as follows:

> For purposes of this section, a plan in critical status shall be treated as in critical and declining status if the plan is described in one or more of subparagraphs (A), (B), (C), and (D) of paragraph (2) and the plan is projected to become insolvent within the meaning of section 1426 of this title during the current plan year or any of the 14 succeeding plan years . . . .

29 U.S.C. § 1085(b)(6). The subparagraphs referenced in § 1085(b)(6) describe a plan's financial condition in terms of the projected value of its assets compared to its projected liabilities. For example, subparagraph (D) provides the following:

> A plan is described in this subparagraph if the sum of—
>
> (i) the fair market value of plan assets, plus
>
> (ii) the present value of the reasonably anticipated employer contributions for the current plan year and each of the 4 succeeding plan years, assuming that the terms of all collective bargaining agreements pursuant to which the plan is maintained for the current plan year continue in effect for succeeding plan years,

---

[2] For ease of reference, we refer to and quote the statutes as they appear in the United States Code. Because Title 29 of the U.S. Code is not a "positive law" title—meaning that Congress has not enacted the compilation itself into law—the authoritative versions are those that appear in the Statutes at Large. *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 448 & n.3 (1993). But besides making the statutory cross-references easier to follow, the textual differences introduced by the compilers of the U.S. Code are inconsequential and do not affect our analysis. *Compare, e.g.*, American Rescue Plan Act of 2021 § 9704, 135 Stat. at 190 ("within the meaning of section 305(b)(6) [of ERISA]"), *with* 29 U.S.C. § 1432(b)(1)(A) ("within the meaning of section 1085(b)(6) of this title").

8

>is less than the present value of all benefits projected to be payable under the plan during the current plan year and each of the 4 succeeding plan years (plus administrative expenses for such plan years).

*Id.* § 1085(b)(2)(D). Section 1085(b)(6) also references the definition of insolvency in 29 U.S.C. § 1426, which provides that "a multiemployer plan is insolvent if the plan's available resources are not sufficient to pay benefits under the plan when due for the plan year." *Id.* § 1426(b)(1).

These provisions do not, by their terms, exclude a plan that was terminated by mass withdrawal (that is, a plan that had at one time stopped receiving employer contributions). The PBGC does not dispute that such a plan could meet these criteria, nor does it dispute that the Fund meets them here.

Instead, the PBGC points to 29 U.S.C. § 1081(c), which provides that Part 3 of Subchapter I of ERISA—which includes § 1085 but not the SFA statute—"applies, with respect to a terminated multiemployer plan," only "until the last day of the plan year in which the plan terminates." For example, when a plan in critical and declining status terminates, it is only required to continue implementing a rehabilitation plan, as required by § 1085(a)(3)(A), through the end of that year. The PBGC argues that § 1081(c) applies to the status definitions in § 1085 as well as its requirements. And because the Fund terminated in 2016,

9

the PBGC argues, it could not have a "status" under § 1085 in the 2020, 2021, or 2022 plan years, making it ineligible under § 1432(b)(1)(A).

We disagree. Section 1081(c) does not apply to the SFA statute, which is located in a different part of a different subchapter. Nor does it apply by virtue of its application to § 1085. By using the phrase "within the meaning of section 1085(b)(6)," *id.* § 1432(b)(1)(A), the SFA statute incorporates by reference only the definition contained in § 1085(b)(6). It does not incorporate external limitations on § 1085's operation, such as the limitation contained in § 1081(c).[3] "[A] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute," meaning that it incorporates its text and nothing else. *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209 (2019); *see also* 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 51:8 (7th ed. rev. Aug. 2012) ("A statute of specific reference adopts only the particular parts of the statute to which it refers."); *id.* § 51:7 ("[W]here a statute refers specifically to another statute by title or section number, there is no reason to think its drafters meant to incorporate more than the provision specifically referred to." (alteration in original) (internal quotation marks omitted)).

---

[3] We assume without deciding that § 1081(c) limits the applicability of the status definitions contained within § 1085 and not just the requirements imposed by § 1085.

10

The legal force of an incorporated reference derives from the statute making the reference, not from the document being incorporated. *See Interstate Consol. St. Ry. Co. v. Massachusetts*, 207 U.S. 79, 84–85 (1907) (Holmes, J.). This is because an incorporated provision "exists not as any part of the referenced material itself, but rather as a duplicate or 'clone' of the referenced material that has been created within the adopting legislation." F. Scott Boyd, *Looking Glass Law: Legislation by Reference in the States*, 68 La. L. Rev. 1201, 1221 (2008). So "it [does] not matter what [the incorporated statute's] own nature or effect might be"—in this case, the nature or effect of § 1085(b)(6)—"as the force given to it by reference and incorporation [is] derived wholly from the [law incorporating it]." *Interstate*, 207 U.S. at 84–85. Any limitation that § 1081(c) might place on § 1085(b)(6)'s operation would not affect the operation of § 1085(b)(6)'s "clone" within the SFA statute. Boyd, *supra*, at 1221.

Moreover, if Congress had wanted to incorporate the various limitations on § 1085's applicability, along with its definition, it could have used a phrase such as "for purposes of section 1085(b)(6)" or "to which section 1085(b)(6) of this title applies"—phrasing that it did use in other parts of the same SFA section. *See* 29 U.S.C. § 1432(b)(1)(D) (a plan is eligible if "the plan became insolvent *for purposes*

11

*of section 418E of title 26* after December 16, 2014 . . . ." (emphasis added)); *id.* § 1432(f) ("Any application by a plan for special financial assistance under this section shall be submitted to the corporation (and, in the case of a plan *to which section 432(k)(1)(D) of title 26 applies*, to the Secretary of the Treasury) no later than December 31, 2025 . . . ." (emphasis added)). Because Congress chose to use different language—"within the meaning of"—when referring to § 1085(b)(6), "we presume its word choice was intentional," *Hirt v. Equitable Ret. Plan for Emps., Managers & Agents*, 533 F.3d 102, 108 (2d Cir. 2008) (internal quotation marks omitted).

Congress also knew how to exclude terminated plans expressly—which it did in one of the other SFA eligibility provisions. *See* 29 U.S.C. § 1432(b)(1)(D) (a plan is eligible for SFA if it "became insolvent . . . and has remained so insolvent *and has not been terminated as of March 11, 2021*" (emphasis added)). The fact that Congress chose not to include a similar limitation in subparagraph (A), the provision at issue here, is telling.

Finally, the PBGC asserts that permitting terminated plans to apply for SFA funding "would severely challenge PBGC's ability to process the applications of all eligible plans within the tight statutory deadlines." PBGC Suppl. Br. at 8, Dkt.

12

62.1. While we are sympathetic to these difficulties, "[i]t is Congress's job to craft policy and ours to interpret the words that codify it." *Lackey v. Stinnie*, 145 S. Ct. 659, 669 (2025). And the words that Congress chose to codify eligibility for SFA do not support a per se exclusion of terminated plans under § 1432(b)(1)(A).[4] The PBGC acted contrary to law when it concluded otherwise and denied the Fund's SFA application on that basis.[5]

## CONCLUSION

The judgment of the district court is REVERSED and the case is REMANDED with instruction to (1) enter summary judgment for the Fund, (2) vacate the PBGC's denial of the Fund's SFA application, and (3) remand to the PBGC for reconsideration.

---

[4] The PBGC also estimates that our reading will result in a significantly greater number of SFA-eligible plans than the Congressional Budget Office ("CBO") estimated. Even if we were inclined to consider these extra-record calculations, the complete absence of data or methodological detail accompanying the PBGC's estimates prevents us from doing so meaningfully. In any event, we are reluctant to infer congressional intent from a CBO projection, particularly when such an inference would contradict the plain text of the statute Congress enacted.

[5] Because we conclude that § 1432(b)(1)(A) does not exclude terminated plans per se, we need not decide whether ERISA permits a terminated multiemployer plan to be restored.

13